858 A.2d 1134 (2004)
372 N.J.Super. 355
STATE of New Jersey, Plaintiff-Respondent,
v.
Larry BARASCH, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 2004.
Decided October 15, 2004.
John C. Whipple, Morristown, argued the cause for appellant (John C. Whipple attorneys; Mr. Whipple and Mary Gibbons Whipple, on the brief).
Edward Quigley, Assistant Prosecutor, argued the cause for respondent (John Kaye, Monmouth County Prosecutor, attorney; Mr. Quigley, of counsel and on the brief).
*1135 Before Judges KESTIN,[1] LEFELT and ALLEY.
The opinion of the court was delivered by
LEFELT, J.A.D.
A jury acquitted defendant Larry Barasch of theft, but convicted him of second-degree failure to remit collected State sales taxes in an amount of $75,000 or more, N.J.S.A. 54:52-15. Judge Cleary sentenced defendant to five years imprisonment with restitution of $187,742.46. Defendant appeals, advancing the following five arguments: (1) that Judge Cleary erred when, without any invitation, she interrupted jury deliberations; (2) that the judge erroneously instructed the jury on the elements of N.J.S.A. 54:52-15, by failing to advise the jury that defendant must not only purposely fail to remit the collected Sales taxes but must also intend to evade or avoid tax responsibility; (3) that the trial judge erred by not limiting the victim's testimony to the theft charge; (4) that trial counsel was ineffective; and (5) that the trial judge erred by imposing an excessive sentence.[2] We reject arguments (3), (4), and (5) as having insufficient merit to warrant further discussion, R. 2:11-3(e)(2), and explain in this decision why we reject defendant's first two arguments and affirm.

I.
Beginning in 1994, defendant Larry Barasch opened Great Feeling Spas, Inc. as a new business. Originally, defendant intended to retail and install Cal Spa spas by capitalizing on his previous experience constructing decks and installing spas. By 1996, however, defendant had ceased constructing decks as Great Feeling Spas was expanding rapidly, with sales increasing from ten to thirty percent each year. As the business grew, Great Feeling Spas became involved with additional suppliers besides Cal Spa and also began retailing gazebos, pool tables, and other luxury home entertainment.
From the outset, Great Feeling Spas experienced taxation problems. By September 29, 1998, the business had incurred a $235,039.33 sales and use liability. This liability expanded by almost $40,000 as the State, in September 1998 and February 1999, noticed the deficiency and demanded payments within ninety days. By July 1999, the State had obtained a judgment against Great Feeling Spas and defendant personally.
In November 1999, defendant entered into an installment payment plan with the State. Defendant agreed to pay $628,226 in one down payment of $50,000 and thirty-six payments of $20,493 beginning December 1999. Defendant, at this time, also *1136 promised to pay all future taxes in a timely fashion.
Unfortunately, in October 2000, defendant developed two hernias and underwent surgery in January 2001. Because of the surgery, defendant was unable to return to work until March. During defendant's absence from the business, his wife Ann, who had been the bookkeeper, expanded her functions in an effort to cover defendant's absence.
Great Feeling Spas again fell into tax problems. It filed an untimely return for the fourth quarter of 2000, resulting in the addition of interest and penalties to defendant's twenty-first or twenty-second[3] installment payment made under defendant's 1999 payment plan. The agreed December 2000 monthly payment was not made until January 27, 2001, but when made also included January's monthly payment.
For the first, second and third quarters of 2001, Great Feeling Spas's tax returns were late and deficient in amount. Consequently, the State voided the 1999 payment plan, although defendant was permitted to continue making payments to reduce liability. Defendant failed to pay the January, March, and April 2001 installments, but paid these arrears by May. Delinquency on his regular filings also triggered a notice and demand for payment in July 2001 and a final warning visit from a Division of Taxation field investigator and his supervisor in August 2001.
A new payment schedule for $222,229 which was then owed by defendant was developed, but the State would only acquiesce to the plan if defendant paid $81,595 for the third quarter of 2001, by November 20, 2001. The amount requested by the State constituted the sales taxes defendant had just collected from the third quarter. Defendant failed to pay by November 20 and instead, on November 21, filed a Chapter 11 bankruptcy petition.
Defendant was arrested in December 2001 and indicted in March 2002. The indictment charged defendant with second-degree theft by failure to make the required disposition of over $75,000 collected from customers, N.J.S.A. 2C:20-9, and second-degree failure to remit taxes collected or withheld, N.J.S.A. 54:52-15. The indictment alleged that these offenses occurred during various dates in 2001.
Criminal investigation discovered approximately 115 individuals who had purchased spas from Great Feelings Spas and failed to receive their merchandise. Of the 115 persons, sixty had proof of purchase including copies of contracts and checks totaling close to $400,000. The investigation also disclosed that these monies had been deposited into the business's bank account and withdrawn for rent, tax, and salary payments. For the years 1999, 2000, and 2001 respectively, despite the increasing turmoil, defendant and his wife earned wages from the business in the amounts of $145,200, $180,000 and $250,000.
At defendant's trial, twenty-five witnesses testified that they failed to receive merchandise despite payment. Very few received refunds and none have received money as a result of the bankruptcy. The customers testified that they paid in full, by cash, check, and credit card, some by rendering deposits first, then paying the balance. Defendant attributed the delivery failures to world events, including *1137 September 11, 2001, as well as supplier issues related to the bankruptcy.
Great Feeling Spas closed its doors on August 20, 2002, after being evicted for late payment of rent. Ten days later, the bankruptcy proceedings were converted to Chapter 7.
Defendant's criminal trial began on March 17, 2003. Also in March, the bankruptcy trustee filed a complaint against defendant and his wife, alleging preferential transfers and fraud. After defendant's trial, the jury acquitted him of the theft charge, but convicted him of second-degree failure to remit sales taxes collected or withheld in an amount of $75,000 or more, N.J.S.A. 54:52-15.

II.
Defendant's first argument is that the court's unsolicited interruption of jury deliberations resulted in a coerced, compromised verdict, which came almost immediately after the judge's interruption.
Jury deliberations in defendant's trial began after a mid-day lunch break on Friday. At approximately 4:30 p.m. that day, after about three hours of deliberations without any indication that the jury was deadlocked, the court brought the jury to the courtroom and stated that "as you know, we usually end the Court day around this time. Usually a little bit before." The court acknowledged that it did not know where the jury was in its deliberations and whether the jury was "almost at a verdict or not." The court suggested to the jury "that we end here and come back on Monday unless you think you're close to a verdict then we could stay a little while longer. But I don't anticipate staying any much longer than 5:00." The court further emphasized that it was "not trying to pressure [the jury] into any verdict or anything." The court also explained to the jury that it chose 5:00 "because everything's done in computer here and they start turning off the air conditioning around 5:00. I don't want anybody to feel uncomfortable in there." The court then asked whether the jury "could let me know what you want to do." The court told the foreperson to find out, "whether you would like to end now or a little while would help or you'd like to come back on  end now and come back on Monday or wait a little while if you think you're close to a verdict." While the court asked the foreperson to "see what everyone wants to do and then you'll come out and let me know," the jury returned its unanimous verdict at 4:47 p.m.
Needless to say, no judge may coerce a jury into rendering a verdict that does not represent the unfettered and unbiased judgment of each juror. In re Stern, 11 N.J. 584, 588, 95 A.2d 593 (1953). In this case, as in State v. DiFerdinando, 345 N.J.Super. 382, 392, 785 A.2d 440 (App. Div.2001), certif. denied, 171 N.J. 338, 793 A.2d 717 (2002), the court interrupted deliberations, though neither jury indicated that they were deadlocked. In DiFerdinando, the jury was in its fifth day of deliberations when interrupted by the judge. Id. at 390, 785 A.2d 440. The judge advised the jury, in response to a question asking what constitutes a hung jury, that a mistrial would be declared by 3 p.m. that afternoon if the jury indicated that further deliberations would not result in a verdict. Id. at 396, 785 A.2d 440. We sustained the instruction.
We have also previously affirmed a judge's inquiry that was similar to the inquiry in this case. In State v. Tarlowe, 370 N.J.Super. 224, 851 A.2d 53 (App.Div. 2004), two hours into jury deliberations, at approximately 5:00 p.m. on Thursday, the court asked whether it wanted to recess for the night or continue deliberations the *1138 following Wednesday, which was the next available trial date. Id. at 238, 851 A.2d 53. The jury chose to continue deliberations, and we upheld the judge's interruption as not "clearly capable of producing an unjust result." Ibid. (citing R. 2:10-2).
At times, even explicit time constraints on deliberations have been permitted. Our prior Supreme Court, for example, found unobjectionable a judge's statement "that if a verdict was not rendered by a certain hour in the evening, [he] would leave the court house and [the jury] would not be able to render a verdict until the following morning...." State v. Hauptmann, 115 N.J.L. 412, 445-46, 180 A. 809 (E. & A.), cert. denied, 296 U.S. 649, 56 S.Ct. 310, 80 L.Ed. 461 (1935). But see State v. Nelson, 304 N.J.Super. 561, 566, 701 A.2d 726 (App.Div.1997), which discourages specific time restrictions on jury deliberations.
We reject defendant's argument that a bright-line rule is necessary to prohibit any interruption of jury deliberations. Quite obviously there are many legitimate reasons, in addition to the trial management reason involved herein, for a court to interrupt jury deliberations. As our precedents demonstrate, the evaluation of a judge's interruption of a jury's deliberations has been, and in our opinion should continue to be, on a case-by-case basis.
We believe that the judge's interruption in this case was not prejudicial to defendant because what was said cannot be objectively interpreted as coercing any individual member of the jury to forego his or her independent judgment of the case. For example, in State v. Vergilio, 261 N.J.Super. 648, 619 A.2d 671 (App.Div.), certif. denied, 133 N.J. 443, 627 A.2d 1147 (1993), we found coercion when the court asked the jury foreperson whether the jury would like to continue deliberations, despite its direct knowledge of one juror being continuously pressured by the other eleven members. Id. at 655-56, 619 A.2d 671.
Although the jury's verdict in this case came promptly after the judge's inquiry, the jury had deliberated for over three hours and there was no indication that deliberations were impaired in any manner. The judge's inquiry was not improperly coercive. In fact, the judge carefully advised the jury that she did not want to pressure a verdict. Her inquiry, in our opinion, was made out of necessity and common courtesy.
Although we have rejected defendant's argument for a bright-line rule in this matter, we emphasize that judges should interrupt jury deliberations only when absolutely necessary. As our Supreme Court has pointed out, "[t]rial courts must understand ... that nothing is more important than that they set the atmosphere of calm, unhurried, and studied deliberation that is the hallmark of a fair trial." State v. Roberts, 163 N.J. 59, 60, 747 A.2d 274 (2000).

III.
Defendant also argues that his conviction of N.J.S.A. 54:52-15 must be reversed because the jury instructions were faulty. N.J.S.A. 54:52-15, in pertinent part, provides that a third-degree crime is committed if a person "after having collected or withheld taxes as required by any State tax law, ... purposely fails to turn over the taxes to the Director of the Division of Taxation in the manner and at the time prescribed by law." The crime becomes one of second-degree, as in this case, when "the amount of the tax collected or withheld is $75,000.00 or more." N.J.S.A. 54:52-15.
Defendant argues that the trial court's charge was erroneous because the jury *1139 was advised that it could convict defendant solely for purposely failing to turn over the sales taxes. Defendant argues that more specific criminal intent is required, and the jury should have been advised that a crime is committed only if defendant purposely failed to pay the taxes in order to avoid or evade his responsibilities.
To support his argument, defendant cites our decision in State v. Damiano, 322 N.J.Super. 22, 730 A.2d 376 (App.Div. 1999), certif. denied, 163 N.J. 396, 749 A.2d 369 (2000). Damiano explained that "for criminal liability to attach to the individual acts or the course of conduct engaged in by a businessman on the brink of insolvency, there must be criminal intent...." Id. at 36, 730 A.2d 376. Without the requisite criminal intent, defendant may not be culpable of any crime. N.J.S.A. 2C:2-2(a) ("[A] person is not guilty of an offense unless he [or she] acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense.").
We also noted in Damiano, however, that criminal intent is "defined by the criminal statutes." Supra, 322 N.J.Super. at 36, 730 A.2d 376. Thus, the question becomes what criminal intent or state of mind is required to be guilty of violating N.J.S.A. 54:52-15?
N.J.S.A. 54:52-15 was applied in this case to the failure to remit taxes after collecting a 6% sales tax, which is generally added to the retail price of products subject to the sales tax and paid by the customer. N.J.S.A. 54:32B-3. When dealing with a failure to collect the tax, as contrasted with the failure to remit the tax after its collection, the Legislature has provided that criminal culpability requires "the intent to evade, avoid, or otherwise not make timely payment of any tax...." N.J.S.A. 54:52-14. The Legislature provides, however, that after the tax is collected criminal culpability requires "purposely fail[ing] to turn over the taxes to the Director... in the manner and at the time prescribed by law." N.J.S.A. 54:52-15.
These provisions are clear on their face. When statutory language is unambiguous, our obligation is to apply the legislative intent as expressed in the statute's language. State v. Rama, 298 N.J.Super. 339, 342, 689 A.2d 776 (App.Div.1997), aff'd, 153 N.J. 162, 707 A.2d 999 (1998). Even though we must strictly construe penal statutes, legislative intent nevertheless controls the construction. State v. Tischio, 107 N.J. 504, 511, 527 A.2d 388 (1987).
The legislative intent is embodied in the statutory structure. When the alleged criminal conduct involves acts taken before the tax is collected or withheld, the actor's criminal knowledge may be ambiguous. To ensure that the acts are legitimately punishable as crimes, the Legislature requires that the State prove the acts were taken with the "intent to evade, avoid, or otherwise not make timely payment...." See N.J.S.A. 54:52-14 (failure to collect or withhold), N.J.S.A. 54:52-13 (failure to register or be licensed), and N.J.S.A. 54:52-8 (failure to file returns or report). For example, if a defendant has failed to collect the taxes, or has failed to obtain a license from the Division of Taxation, or has failed to file a return, these acts could be attributed to simple carelessness or poor business practices, and culpability may be ambiguous. To ensure criminality under these circumstances, the Legislature requires the State to establish that the defendant failed to act because he or she intended to evade or avoid the tax payments.
After a defendant has collected or withheld the taxes as required by State law, however, defendant should know that *1140 the taxes collected or withheld are not personal property but are held essentially in trust for the State. Failure to remit the taxes in these circumstances is less ambiguous and more culpable. Consequently, in this instance, criminal conduct occurs when the person "purposely fails to turn over the taxes to the Director ... in the manner and at the time prescribed...." N.J.S.A. 54:52-15. It is not necessary for the State to prove that the failure to remit the collected or withheld tax was with the purpose to evade or avoid payment.
When construing a statute we must reach a construction consistent with the statutory scheme. In re Passaic County Utilities Auth., 164 N.J. 270, 300, 753 A.2d 661 (2000). To interject an intention to avoid or evade payment of taxes when dealing with individuals who fail to remit the taxes after having collected or withheld them, would add language to N.J.S.A. 54:52-15, without any Legislative authority, and would also in our opinion conflict, as we have explained above, with the statutory structure established by the Legislature.
A similar provision of the Internal Revenue Code, 26 U.S.C.A. § 6672, imposes a "willfulness" requirement.[4] The provision provides a penalty for willfully failing to collect a tax, or truthfully account for and pay over the tax. Ibid. The provision also penalizes any person who "willfully attempts in any manner to evade or defeat any such tax or the payment thereof...." Ibid.
Thus, the federal law establishes in one provision what New Jersey has chosen to provide in several and allows punishment of persons who intentionally fail to remit the tax or intentionally attempt in any way to evade or defeat the tax. Criminal culpability, under the federal law is, therefore, similar to New Jersey's tax provisions.
Under federal law, a failure to pay the collected tax is not excused by financial difficulties. E.g., Ruth v. United States, 823 F.2d 1091, 1095 (7th Cir.1987); Wright v. United States, 809 F.2d 425, 427 (7th Cir.1987). A failure to pay over collected tax is willful if it is voluntary, knowing, and intentional, even though no bad purpose or evil motive is present. Barnett v. United States, 594 F.2d 219, 222 (9th Cir.1979). Once aware of a tax obligation, other creditors may not be paid before payment of withheld taxes. Mazo v. United States, 591 F.2d 1151, 1157 (5th Cir.), certif. denied, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). Even wages may not be preferred over required tax payments. Emshwiller v. United States, 565 F.2d 1042, 1045 (8th Cir.1977).
Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial. State v. Butler, 27 N.J. 560, 595-96, 143 A.2d 530 (1958). The trial court has an absolute duty to instruct the jury on the law governing the facts of the case. Id. at 594, 143 A.2d 530. The court instructed the jury in this case that to find defendant guilty, the State had to prove beyond a reasonable doubt that defendant "collected taxes as required by any state tax law." In addition, the State must prove that defendant collected the taxes "subject to legal obligation." Furthermore, the judge advised the jury that the State had to establish that "this legal obligation was *1141 known to" defendant. Finally, the judge told the jury that the State also had to prove that defendant "purposely failed to turn over the taxes to the Director of the Division of Taxation in the manner and at the time prescribed by law." The judge defined purposeful as an act taken when "it is [the actor's] conscious object to engage in conduct of that nature or to cause such a result." The judge also provided copies of the statute for the jury's use during its deliberations.
The court made specific note of both parties' positions. The court stated that it was "the State's position that during 2001 the defendant collected sales taxes totaling more than $75,000 on sales made by Great Feeling Spas during the first, second and third quarters as well as during the fourth quarter until November 21, 2001." The court further explained that the State argued that "[d]efendant purposely failed to turn over those taxes to the Director of the Division of Taxation." Regarding the State's position on defendant's specific defense, the court explained that the State "contends that the fact that the Defendant was making payments during this period toward back-taxes, penalties and interest which he owed for prior years, did not relieve him of his legal obligation to pay the current taxes collected."
The court also referred to defendant's assertions by stating in part: "The defense contends that it was never [defendant's] conscious object to not turn over the sales tax monies. Rather, having entered into a payment plan and made payments and negotiated further adjustments with [the field investigator] to the payment plan for the year 2001, it was [defendant's] intention to pay the year 2001 taxes."
The court thus in no way intermingled civil and criminal concepts when giving any part of the charge, as we criticized in Damiano, supra, 322 N.J.Super. at 55-56, 730 A.2d 376. The court in this case accurately focused the jury on the issues to be decided and did not commit the errors we described in Damiano. Here, the criminal conduct was carefully delimited and not blurred with civil responsibility. Although the trial court incorrectly precluded the defendant in Damiano from demonstrating his understanding that another individual was responsible for the tax payments, id. at 54, 730 A.2d 376, here the trial court correctly presented defendant's lack-of-criminal-intent defense to the jury. Cf. State v. Green, 86 N.J. 281, 287-88, 430 A.2d 914 (1981). The judge juxtaposed the defense against the State's position in order to highlight the factual dispute dividing the parties that was for the jury to resolve.
We conclude that the charge, as rendered by Judge Cleary, accurately defined the state of mind required to find defendant guilty of violating N.J.S.A. 54:52-15. Having concluded that the jury was properly instructed, we reject defendant's argument seeking reversal of his conviction.
Affirmed.
NOTES
[1] Judge Kestin did not participate in oral argument, but has, with the consent of counsel, joined in this opinion. R. 2:13-2(b).
[2] Defendant phrased these arguments as follows:

Point I. The court's unprompted interruption of jury deliberations and suggestions to the jury resulted in a coerced verdict.
Point II. The trial court committed plain error during the jury charge when it failed to adequately explain the element of criminal intent where defendant's conduct subjected him to both civil and criminal liability.
Point III. It was plain error for the trial judge not to give an instruction limiting the testimony of alleged victims of the theft count.
Point IV. Defendant's trial lawyer rendered ineffective assistance of counsel by failing to move post-verdict for a new trial based upon the insufficiency of the evidence. Thus, this court should relax Rule 2:10-1 and permit presentation of a weight of the evidence argument set forth herein.
Point V. The court erred at sentencing by failing to sentence the defendant as a third degree offender.
[3] Testimony by two State witnesses conflicts over which payment was increased as a result of defendant's failure.
[4] This provision, in pertinent part, provides "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over."